IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No. 1:22-CR-86 |
| v. | ) |
| | ) The Honorable Leonie M. Brinkema |
| KEVIN MCAVENIA, | ) |
| | ) Sentencing: November 1, 2022 |
| *Defendant.* | ) |
| | ) |

## **POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The defendant, Kevin McAvenia, comes before the Court for sentencing after pleading guilty to one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). The applicable guidelines range for both offenses has been correctly calculated in the Presentence Investigation Report ("PSR") as 121-151 months' imprisonment. *See* Dkt No. 46 (PSR), ¶ 114.

For over two decades, this defendant has sought out child pornography—child sexual abuse material (CSAM)—using sophisticated methods and technology. Meanwhile, he was entrusted with keeping our community safe, as an EMT and as a federal contractor dealing in chemical, biological, radiological, and nuclear weapons. *See* PSR ¶ 38. The content and quantity of the material this defendant downloaded from the dark web, transported to his cloud-storage account, and always kept close at hand—depraved videos and images depicting the sexual, often sadistic abuse of children—demonstrates the opposite of concern for the most vulnerable members of our society; rather, it demonstrates the defendant's seemingly insatiable appetite for visual depictions of that abuse. And his need to consume CSAM, or at least to view sexualized images of young

children, has not lessened since his apprehension.

For the reasons that follow, the United States respectfully submits that a Guidelines sentence is sufficient but not greater than necessary to effectuate the statutory sentencing factors under 18 U.S.C § 3553(a). The United States also respectfully requests that the Court impose a substantial term of supervised release, forfeiture of the electronic devices used in connection with the offense, and restitution and special assessments as set forth in statute and pursuant to the plea agreement.

**I.     Background**

This defendant has consumed child sexual abuse material, and contributed to the overwhelming demand for such content, for over twenty years. As the defendant told law enforcement, he would delete his collection every so often and then "start again"—seeking out, downloading, and viewing CSAM—months later. Initially, the defendant used peer-to-peer websites to participate in the illicit market. Most recently, he sought illicit content through The Onion Router ("TOR")'s hidden services.[1] *See* PSR ¶ 33; Dkt No. 34 (Statement of Facts), ¶ 6. The defendant bookmarked his favorite or most frequently used TOR websites; nearly all were TOR forums where CSAM is promoted and traded.[2] *See* Affidavit, Dkt No. 2, at 9. Yet until the

---

[1] The Onion Router "("TOR")", sometimes referred to the "dark web", hides the IP address of the internet user and thereby hinders identification of individuals engaging in criminal activity. Many standard websites can be accessed through Tor, but there are some websites ("onion services" or "hidden services") that can only be accessed through Tor. Since hidden services cannot be accessed through search engines such as Google, a user must either know the address of the hidden service or be linked to it from another website or hidden service. *See United States v. Levin*, 874 F.3d 316, 319 (1st Cir. 2017). Although these hidden services provide marketplaces for all types of criminal activity, it has been estimated that the vast majority of the dark web activity is dedicated to child sex abuse material. *See* Andy Greenberg, *Over 80 Percent of Dark-Web Visits Relate to Pedophilia, Study Finds*, Wired (Dec. 30, 2014), https://www.wired.com/2014/12/80-percent-dark-web-visits-relate-pedophilia-study-finds/.

[2] The names of those sites included phrases such as "Free Child Porn" and "Naughty Kids." *See* Affidavit in Support of Criminal Complaint and Arrest Warrant ("Affidavit"), Dkt No. 2, at 9.

defendant began uploading his CSAM collection to his Google Drive account, he stayed largely under the radar.[3]

Beginning in December 2020—and until his Google account was deactivated—the defendant transported his child pornography files from his laptop computer to his Google Drive account. When a search warrant was executed on that account, law enforcement found hundreds of video and image files depicting minors engaging in sexually explicit conduct, including prepubescent females engaging in bestiality and prepubescent minors engaging in vaginal and oral sex. *See* Affidavit, Dkt. No. 2, at 3-4.

A search was subsequently executed at the defendant's residence in Arlington, Virginia. Multiple digital media and devices were seized, including a laptop computer, an intel Processor desktop computer, and a network-attached storage device. Among those three devices, at least 6,800 video and image files depicted minors engaging in sexually explicit conduct. The majority of those were video files, amounting to over 21 hours of child sexual abuse material on the laptop and desktop alone. PSR ¶ 34. These videos included depictions of prepubescent minors, minors who had not attained the age of 12 years, depictions of sadistic and masochistic conduct, and depictions of the sexual abuse and exploitation of a toddler. For example, a 39-minute video, titled, in part "3y girl . . . molested by . . . sexy babysitter" was one of the defendant's 30 most recently played videos in the VLC media player. All 29 other videos depicted CSAM as well. PSR ¶ 36. Some of the videos most recently viewed by the defendant were part of series depicting a 15-year-old female who was forced to perform various sado-masochistic sex acts under duress.

---

[3] In his interview with law enforcement, the defendant admitted that he had shared his interest in child pornography during a polygraph examination several years earlier (in 2016). However, since the defendant was not actively downloading CSAM at that time, law enforcement did not find contraband on his device when they subsequently searched it.

The defendant's collection contained 258 disturbing image and video files of that victim showing the young girl gagging and crying as she is forced to defecate on the floor, eat her own feces, and masturbate with them. PSR ¶ 34. These files, and the thousands of other videos and images located on the defendant's devices, date from late July 2021 through early January 2022; they represent a mere six-month snapshot in the defendant's collection over two decades.

## II.     Statutory Minimum and Maximum Penalties

Receipt of child pornography carries a minimum term of 5 years' imprisonment with a maximum term of 20 years' imprisonment. *See* 18 U.S.C. § 2252(a)(2) and (b)(1). Possession of child pornography carries a maximum term of 20 years' imprisonment. *See* 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (increasing maximum term of imprisonment because a "visual depiction involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age"). Following any term of imprisonment, the defendant must be placed on supervised release for a term of at least 5 years up to a lifetime term. 18 U.S.C. § 3583(k).

## III.    Guidelines Calculations

As the Court is aware, although the Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Thus, at sentencing, a court "must first calculate the Guidelines range" applicable to the defendant. *Nelson v. United States*, 555 U.S. 350, 351 (2009); s*ee also Gall v. United States*, 552 U.S. 38, 49-50 (2007). Here, the PSR correctly calculated the total offense level for the defendant under the Guidelines as follows:

| Guideline | |
|---|---|
| Base offense level because the defendant was convicted of 18 U.S.C. § 2252(a)(2) (U.S.S.G. § 2G2.2(a)(2)) | 22 |

| | |
|---|---|
| The material involved a prepubescent minor or a minor who had not attained the age of 12 years. (U.S.S.G. § 2G2.2(b)(2)) | +2 |
| The offense involved a material that portrays sadistic or masochistic conduct or other depictions of violence, or the sexual abuse or exploitation of an infant or toddler. (U.S.S.G. § 2G2.2(b)(4)) | +4 |
| The offense involved the user of a computer or interactive service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material. (U.S.S.G. § 2G2.2(b)(6)) | +2 |
| The offense involved at least 600 images. (U.S.S.G. § 2G2.2(b)(7)(D)) | +5 |
| **TOTAL OFFENSE LEVEL** | 35 |

PSR at ¶¶ 50-62. Counts 1 and 3 are grouped for guideline calculation purposes pursuant to U.S.S.G. § 3D1.2(d). PSR ¶ 7, 49.

The PSR also properly found that the defendant has clearly demonstrated acceptance of responsibility for this offense and is therefore entitled to a two-level decrease in offense level under U.S.S.G. § 3E.1.1(a). *Id* at ¶ 47, 60. Moreover, the defendant has assisted authorities in the prosecution of his own misconduct by timely notifying the government of his intention to enter a plea of guilty. Accordingly, the government moves for an additional one-level decrease in the offense level pursuant to U.S.S.G. § 3E1.1(b) and the plea agreement. PSR ¶ 9, 61. The defendant's criminal history score is zero, resulting in a Criminal History Category I. *Id* at ¶ 65. Based on a total offense level of 32 and Criminal History Category I, the defendant's Guidelines sentencing range is 121-151 months of incarceration. *Id* at Part D. Neither the government nor the defendant has submitted any objection to this calculation.

**IV.    Section 3553(a) Factors**

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is

appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. As explained below, consideration of these factors suggests that a Guidelines sentence is appropriate in this case.

### A.     The nature, circumstances, and seriousness of the defendant's offense

Child pornography offenses are extraordinarily serious offenses, and certainly are not victimless crimes. As the Supreme Court has recognized, all child pornography crimes "produce[] concrete and devastating harms for real, identifiable victims." *Paroline v. United States*, 572 U.S. 434, 457 (2014). Such crimes inherently involve the sexual abuse of children, even if no new child pornography is produced. *See New York v. Ferber*, 458 U.S. 747, 759 (1982). Trafficking in child pornography is "intrinsically related to the sexual abuse of children in at least two ways." *Id.* First, increased demand for child pornography is associated with increased supply: Far from being victimless, trafficking in child pornography "harms children in part because it drives production [of child pornography], which involves child abuse." *Paroline*, 572 U.S. at 439-40; *see also Ferber*, 458 U.S. at 759 ("[T]he distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled.").

Second, "[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography. Such images are 'a permanent

6

record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458 U.S. at 759); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012) ("[C]hild pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials."). "Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *accord United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children "must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," and they "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547-48.

      Here, through the thousands of videos and images of child sexual abuse contained on the defendant's devices, the defendant perpetuated the victimization of countless children whose exploitation is memorialized in those graphic depictions of their abuse.[4] As described in the victim impact statements, the actual children depicted continue to suffer deeply by the defendant's actions—his collecting such images and videos, and his taking a perverse pleasure in the heinous sexual abuse they endured.

---

[4] Unfortunately, only a small fraction of the defendant's victims have been identified. *See* PSR ¶ 41 (237 images and 157 videos containing NCMEC-identified victims).

For instance, the defendant possessed a video depicting a minor victim known as "Lily." Lily was repeatedly raped and subjected to other forms of sexual abuse by her biological father when she was a prepubescent minor. As Lily explains in her letters to the court,

> While the abuse from my original abuser was awful, as time goes on that is farther and farther away from me. He is in jail and can never hurt me, and that is over. The men that download my pictures are all around me for all I know, and this part of my abuse could keep going on forever. I have no control over it at all. This is frightening beyond belief.

*See* PSR, Addendum, at 38 ("Victim Impact Statement"). Although the physical abuse has ended, Lily describes the enduring trauma caused by each defendant who downloads or views her images:

> I live everyday with the horrible knowledge that many people somewhere are watching the most terrifying moments of my life, and taking grotesque pleasure in them. I am a victim of the worst kind of exploitation: child pornography. Unlike other forms of exploitation, this one is never ending. Everyday people are trading and sharing videos of me as a little girl being raped in the most sadistic ways. They don't know me, but they have seen every part of me. They are being entertained by my shame and pain. … It sickens me to the core and terrifies me. So many nights I have cried myself to sleep thinking of a stranger somewhere staring at their computer with images of a naked me on the screen. I have nightmares about it often.

*Id.* With each criminal case that involves Lily's images, she "know[s] that many more copies of [her] images are spread around the internet" and that "there is a lesser and lesser chance that the horror [she] feel[s] about people seeing [her] in this way will ever end." *Id.* at 46.

The defendant possessed video files of another minor victim's sexual abuse. This victim's family member explains:

> [The victim] suffers severe anxiety attacks and has been diagnosed with anxiety, depression, visual and auditory hallucinations as a result of the crimes committed against her. She is in therapy weekly and is on several prescription medications to help her deal with the ongoing effects of this abuse. While [the victim] does everything that she can to lead a normal life the events of her past have severely impacted her health and well being and continues to cause her ongoing and severe mental health issues. The impact of the abuse that was inflicted upon her is massive and she will suffer its effects for the rest of her life.

PSR, Addendum, at 58 ("Victim Impact Statement"). Moreover, the family member notes the re-victimization that occurs whenever the video is viewed, reiterating that "[t]he fact that this video is on the internet and cannot be stopped is an ongoing abuse that will impact her life and wellbeing for the foreseeable future." *Id.*

For these victims, the trauma and pain endure long after the abuse itself stops: These victims continue to suffer devastating consequences from the knowledge that offenders like the defendant consistently view images and videos that depict their sexual abuse. And while the defendant now admits to his conduct and accepts responsibility for his actions, the irreparable harm he has caused to the victims of his offenses nevertheless warrants a substantial term of incarceration.

**B.     The history and characteristics of the defendant**

Although this defendant has no criminal record, he has admitted to downloading CSAM for nearly two decades. His participation in the illicit market for child pornography is substantial, and he has used sophisticated technology, most recently TOR's hidden services, to avoid law-enforcement detection. While engaging in this criminal behavior, he was entrusted with a Top Secret security clearance and working with lethal materials. *See* Dkt No. 34.

Once confronted, the defendant demonstrated how well-versed he was in the various online communities dedicated to CSAM trafficking. He explained how he would seek out content on TOR and described his two favorite forums to law enforcement. And on his devices, the defendant's CSAM was front and center—physically stored on his desktop in a "Misc" folder and in the downloads folder. The defendant bookmarked his favorite TOR sites and backed up, or stored, his CSAM in three separate places, including on the cloud; he could not be very far from

9

his collection, which, as previously described, contained depraved videos of toddlers and other forms of sado-masochistic abuse.

Moreover, while under the supervision of this Court, the defendant was apparently unable to control himself. Undeterred by his conditions imposed by this Court, he continued to seek out sexualized images of young girls—which appears to be intertwined with his need to consume pornography. *See* Dkt. Nos. 37, 40, 41. That compulsion to fulfill his sexual desires, and his specific interest in minors, makes the defendant a continued threat to children.

### C. The need to promote respect for the law and to afford adequate deterrence to criminal conduct

A sentence within the Guidelines imprisonment range is sufficient but not greater than necessary to deter the defendant and others from engaging in this conduct in the future. As this Court is aware, the defendant engaged in escalating, troubling behavior while on pretrial release—behavior intricately tied to his offense conduct. Considering the number of years that this defendant actively sought out and viewed child sexual abuse material, combined with his behavior on pretrial release, the government maintains that the risk of recidivism associated with this defendant is high. However, even if the defendant could be described as a "low risk" to recidivate, "[a] low risk is not the same as no risk." *United States v. Irey*, 612 F.3d 1160, 1216-17 (11th Cir. 2011). Though no study or expert can predict whether this defendant will or will not choose to return to exploiting children, his actions suggest that such concerns are well-founded. The defendant's years-long conduct indicates an ongoing sexual interest in children and a disregard for their wellbeing and the law. And as recently as last month, his mental health providers raised concerns over his risk of re-offending. *See* Dkt No. 37. Thus, a significant sentence is necessary to deter the defendant from engaging in this dangerous and harmful conduct after he is released.

V.   **Supervised Release**

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release here is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See, e.g.*, Lifetime Consequences for Sex Offenders Act of 2002, H.R. Rep. No. 107–527 at 2 (2002) ("[S]tudies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes [and that] . . . the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66, at 49–50 (2003) (discussing how amendment to 18 U.S.C. § 3583(k) "responds to the long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders . . . whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison"). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, *see* U.S.S.G. § 5D1.2(b) (Policy Statement), and the Fourth Circuit has observed that § 3583(k) and 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citations omitted).

Here, the defendant's conduct on pretrial conditions demonstrates the need for considerable supervision in order to protect the public. Accordingly, the United States respectfully recommends that the Court impose a substantial term of supervised release with the conditions of supervision

11

contemplated under 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3(d)(7) for sex offenders required to register under the Sex Offender Registration and Notification Act.

### a. No-Contact Order

The victim Lily has requested an order that the defendant not contact her. As the victim's representative explains,

> We have seen that some defendants are trading images with Lily's real, legal name as part of the file title. Lily has been personally contacted by child pornography "enthusiasts" who have made offensive and frightening remarks and sought in-person contact with her. I, myself, have received correspondence recently from a federal inmate requesting that I pass along apologies to her—what is alarming is that he uses her legal name and says that everyone at his institution who is committed for a child pornography crime knows her. We would appreciate, therefore, that a no-contact order, using her pseudonym, be requested of the court.

PSR, Addendum, at 27.

Here, the defendant downloaded and possessed a video file with the victim's legal name incorporated in the file title. In light of the victim's request, and pursuant to this Court's authority under 18 U.S.C. § 3583(d), the government requests that the terms of the defendant's supervised release include that the defendant have no contact with any of the victims identified in this case

### VI. Special Assessments under the Justice for Victims of Trafficking Act (JVTA) & The Amy, Vicky and Andy Child Pornography Victim Assistance Act (AVAA)

The Justice for Victims of Trafficking Act (JVTA) imposes a mandatory assessment of $5,000 on any non-indigent defendant convicted of, among other offenses, receipt and possession of child pornography.[5] *See* 18 U.S.C. § 3014. While the statute is silent as to how to determine

---

[5] The money obtained from this assessment goes to the Domestic Trafficking Victims' Fund, which awards grants and enhances programming for victims of human trafficking and child pornography. The § 3014(a) assessment is payable after the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim compensation. *See* 18 U.S.C. § 3014(b) & (e).

indigence, courts have treated the imposition of this assessment like the imposition of other post-conviction assessments, where "[t]he defendant bears the burden of proving both his inability to pay at the time of sentencing and that he is not likely to become able to pay a fine upon his release from his term of imprisonment." *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) (internal citations and quotation marks omitted). Relevant factors to consider in this determination include a defendant's future earning potential, assets, educational background, employment history, age, and physical condition. *See United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020) ("[W]e agree with our sister circuits that a district court may consider a defendant's future earning potential when determining his ability to pay an assessment under 18 U.S.C. § 3014(a)." (citations omitted)); *see also United States v. Mann*, 770 F. App'x 649, 650 (4th Cir. 2019).

Here, the PSR details the defendant's assets and liabilities and concludes that the defendant appears to unable to pay fines and the cost of incarceration or supervision. PSR at ¶ 112. However, the defendant is physically capable of working following his term of incarceration and has a wide range of skills and knowledge. He received his EMT license in high school, attended some college courses, and has been working continuously since 2006, earning approximately $36,000 to $72,000 annually. *See* PSR ¶¶ 99-110. He started his own company and has continued to work while on pretrial release. *See* PSR ¶¶ 100, 110. The defendant's wide range of skills and long history of employment, among other factors, indicate that the defendant will be able to pay a $10,000 special assessment ($5,000 per count of conviction) upon his release from imprisonment, if not at the time of sentencing. *See* 18 U.S.C. § 3613 (noting that the liability to pay a fine or restitution shall terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment, whichever is later); *see also United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018). Accordingly, the United States respectfully requests that the Court find the

defendant non-indigent and impose the mandatory $10,000 special assessment under 18 U.S.C. § 3014.

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA). The Act instructs that, in addition to any restitution or other special assessment, courts "shall assess not more than $35,000 on any person convicted of . . . [an] offense for trafficking in child pornography." 18 U.S.C. § 2259A(a)(2).[6] Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* 18 U.S.C. §§ 2259(d), 2259B, and shall be paid in full after any special assessment under 18 U.S.C. § 3013 and any restitution to victims of the defendant's offense, *see* 18 U.S.C. § 2259A(d)(2). In determining the amount to be assessed under 18 U.S.C. § 2259A, courts should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and the guidance in 18 U.S.C. § 3572 for the imposition of fines. *See* 18 U.S.C. § 2259A(c). The United States respectfully requests that the Court impose a reasonable special assessment under 18 U.S.C. § 2259A, in addition to the $200 mandatory special assessment for his felony convictions pursuant to 18 U.S.C. § 3013.

## VII. Restitution

Pursuant to 18 U.S.C. §§ 2259 and 3663, the defendant must pay restitution in the "full amount of the victims' losses as those losses are defined by Section 2259(c)(2)." PSR ¶ 14. *See also Paroline*, 572 U.S. at 458 ("[A] court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."). As part of the plea agreement entered into by the parties, the defendant has

---

[6] The conviction under Count 3, 18 U.S.C. § 2252(a)(4), authorizes a special assessment of "not more than $17,000." *See* 18 U.S.C. § 2259A(a)(1).

agreed that restitution is mandatory under § 2259 and that the Court must enter restitution in an amount not less than $3,000 per victim.  *Id.*  The defendant has also agreed that the Court may defer the imposition of restitution until after sentencing and to waive the requirement under 18 U.S.C. § 3664(d)(5) that the Court determine a final restitution amount no later than ninety days after sentencing.  *Id* at ¶ 15.

The government has received one restitution request at this time.  The government and the victim's attorney are still attempting to reach an agreement with the defendant about the restitution to be ordered in this case.  The government anticipates that a restitution agreement will be reached in this case at the time of sentencing.  In the event the parties are unable to reach such an agreement, the government will separately brief or otherwise address the restitution claims with this Court.

## VIII. Forfeiture

The United States submitted a consent order of forfeiture, signed by the defendant and his counsel, during the plea agreement hearing, *see* Dkt. No. 35, and respectfully requests that the Court order such forfeiture as part of the judgment.

## CONCLUSION

For the reasons above, the United States respectfully requests that the Court impose a sentence that includes a term of imprisonment within the correctly calculated advisory Guidelines range, a substantial term of supervised release, a $200 special assessment pursuant to 18 U.S.C. § 3013, a $10,000 special assessment pursuant to 18 U.S.C. § 3014, and a reasonable special assessment under 18 U.S.C. § 2259A.

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By:    /s/
Rachel L. Rothberg
Special Assistant United States Attorney (LT)
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: Rachel.Rothberg2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to counsel of record in this case.

I further certify that on October 25, 2022, I sent a copy of the foregoing via electronic mail to counsel of record and the U.S. Probation Officer assigned to this matter:

Teneisha Smith
United States Probation Office
Email: Teneisha_Smith@vaep.uscourts.gov

Respectfully submitted,

_____/s/_____
Rachel L. Rothberg
Special Assistant United States Attorney (LT)
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: Rachel.Rothberg2@usdoj.gov